NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

VALENTYNA S., *Appellant*,

*v.*

DEPARTMENT OF CHILD SAFETY, N.S., M.S., *Appellees*.

No. 1 CA-JV 20-0087
FILED 11-3-2020

Appeal from the Superior Court in Maricopa County
No. JD34683
The Honorable Randall H. Warner, Judge

**AFFIRMED**

COUNSEL

Denise Lynn Carroll Attorney at Law, Scottsdale
By Denise Lynn Carroll
*Counsel for Appellant*

Arizona Attorney General's Office, Phoenix
By Sandra L. Nahigian
*Counsel for Appellee Department of Child Safety*

---

**MEMORANDUM DECISION**

Judge Maria Elena Cruz delivered the decision of the Court, in which Presiding Judge James B. Morse Jr. and Judge Paul J. McMurdie joined.

---

**C R U Z**, Judge:

¶1        Valentyna S. ("Mother") appeals the superior court's order terminating her parental rights to her two children.  For the following reasons, we affirm.

### FACTUAL AND PROCEDURAL HISTORY

¶2        Mother is the biological parent of Valerie and Kyle, both born in 2005.[1]   When the children were born, Mother was married to the children's father, Michael S. ("Father").

¶3        Father filed for dissolution of the marriage shortly after the children were born.  A bitter custody battle ensued, and both parties accused the other of domestic violence.  Although the superior court found Mother acted irrationally to disrupt Father's parenting time, in 2008, it awarded the parents joint legal custody and equal parenting time.  Shortly thereafter, Mother sought an out-of-state protection order for her and the children against Father that contradicted the Arizona custody order.  The superior court promptly awarded Father sole legal custody and required that Mother's parenting time be supervised.  The court also ordered Mother to undergo a psychological evaluation.

¶4        Litigation persisted for eight more years.  The superior court rebuffed Mother's attempts for unsupervised visitation out of caution for the children's emotional safety, noting the children harbored "confusion and mistrust" about their relationship with her.  Despite several ongoing counseling or psychological efforts, Mother failed to "change the circumstances and behaviors" that created "barriers to therapeutic intervention for reunification."  Throughout the litigation, the children resided with Father and had little contact with Mother.  According to the

---

[1]      To protect the children's privacy, their names have been changed to pseudonyms.

children, however, Mother "harassed them," their father, their doctors, and their teachers; the children said she "stalk[ed]" them for much of their lives.

¶5            In 2017, when the children were twelve years old, Father died and the children discovered his body in their home. Mother sought custody, but the children moved in with their paternal grandparents. The children's court-appointed best-interests attorney filed a dependency petition, which explained the children were uncomfortable talking to Mother and "they do not want to see Mother." The petition advised the court of concerns for the children's "emotional, mental and physical health in Mother's care." The court granted the petition on a temporary basis, citing abandonment, mental health issues, and a risk of abuse or neglect. The Department of Child Services (the "Department") joined as a co-petitioner after an investigation revealed concerns about Mother's mental health and the poor relationship between Mother and the children.

¶6            Although Mother initially contested the dependency petition, she reversed course, and the court found the children dependent. In a minute entry outlining the complicated factors in developing a case plan for the children, the superior court expressed skepticism that the relationship with Mother and the children could be remediated: "Mother must have an epiphany as to how her behaviors have impacted her children and their relationship with her if there is to be any hope. The likelihood of that occurring is quite remote."

¶7            Throughout the proceedings, the Department provided Mother with referrals for counseling, psychological evaluation, and therapeutic visitation involving the children. Mother refused counseling services for nearly a year. Therapeutic visitation services proved impossible because the children refused to see Mother, and the children's therapist determined that visits with Mother would have a "traumatic effect" on the children. Mother attempted to have a stranger deliver Christmas gifts to the children as she parked nearby; the gifts were refused. After Valerie texted Mother to warn that her paternal grandmother would call the police if Mother returned to the house, Mother responded by telling Valerie her grandmother had "nothing to do with you" and "[Grandma] will get judgement from the God." The children reported they locked their doors nightly because they were afraid that Mother would return to their home. Shortly thereafter, the court prohibited Mother from going to where the children resided and ordered her not to email or text the children.

¶8            Despite the court order—and despite the children adamantly opposing any contact with Mother—the children reported they saw her "in

various locations, including their backyard, school, and at the behavioral health provider." Mother also continued to call and text the children until the court ordered her to refrain from contacting the children "until it has been determined by a therapist to be appropriate."

**¶9** By mid-2018, the children's relationship with their paternal grandparents became strained as they struggled to adjust. Kyle experimented with marijuana, became defiant, and was suspended briefly from school. Valerie admitted to using substances including methamphetamine and cocaine. The children addressed these issues in therapy, and Valerie submitted to regular drug testing. Both children made good progress by the fall. To allow their grandparents to just "be grandparents," the children suggested they live with a family friend willing to provide care for them. After conducting a home study, the Department moved to place the children with the family friend, which the court authorized.

**¶10** The Department moved to terminate Mother's relationship with the children on the grounds of out-of-home placement for fifteen months or longer. *See* Ariz. Rev. Stat. ("A.R.S.") § 8-533(B)(8)(c). After a nine-session trial, at which Mother and numerous mental health services providers testified, the superior court terminated Mother's parental rights to the children, who were nearing their fifteenth birthdays. Mother timely appealed, and we have jurisdiction pursuant to A.R.S. §§ 8-235(A) and 12-120.21(A)(1).

## DISCUSSION

**¶11** On appeal, Mother argues that insufficient evidence supports the superior court's order terminating her rights and that the Department failed to provide appropriate reunification services. We will affirm the court's decision "unless it is clearly erroneous." *Demetrius L. v. Joshlynn F.*, 239 Ariz. 1, 3, ¶ 9 (2016). Because the superior court is best suited to determine the credibility of witnesses and resolve conflicts in evidence, we do not reweigh the evidence. *Id.*; *Dominique M. v. Dep't of Child Safety*, 240 Ariz. 96, 97, ¶ 6 (App. 2016).

**¶12** Although parents have fundamental rights in the care and management of their children, those rights are not absolute and may be terminated if the superior court finds clear and convincing evidence of a statutory ground for termination and finds by a preponderance of the evidence that termination is in the children's best interests. *Kent K. v. Bobby M.*, 210 Ariz. 279, 284, ¶¶ 22, 24 (2005).

I.       Grounds for Termination

¶13       Pursuant to A.R.S. § 8-533(B)(8)(c), the superior court may terminate a parent's rights if the child has been in an out-of-home placement for fifteen months or longer pursuant to court order, "the parent has been unable to remedy the circumstances" causing the child to be in an out-of-home placement, and "there is a substantial likelihood" she will be unable to care properly for her child in the near future.  In determining whether the evidence supports the termination ground, the court considers those circumstances existing at the time of the termination proceedings that prevent the parent from appropriately providing for her child.  *Marina P. v. Ariz. Dep't of Econ. Sec.*, 214 Ariz. 326, 330, ¶ 22 (App. 2007).

¶14       Here, although the children were initially found to be dependent as to Mother on the grounds of abandonment, concerns for Mother's mental health, and a risk of abuse or neglect, it was the nearly non-existent parental relationship—exacerbated by Mother's inability to empathize with the children—that caused the out-of-home placement.  The superior court found the children "do not feel emotionally safe in [Mother's] care."

¶15       Mother argues that significant evidence demonstrates she is a fit parent.  The record shows that Mother underwent several psychological evaluations and met numerous counselors dating back to 2011.  Neither of the Department-referred psychologists testified that Mother has a personality disorder or other mental illness.  The professionals who determined that Mother could parent a child did not interview or otherwise work with Valerie or Kyle.  Therefore, these professionals could not evaluate Mother's ability to parent her two children with significant needs. *See Joelle M. v. Dep't of Child Safety*, 245 Ariz. 525, 527-28, ¶¶ 12-13 (App. 2018) (explaining the superior court must "consider the discrete and special needs of the particular child" in termination proceedings).

¶16       In the more than two years that the children remained dependent as to Mother, she continued to undermine any opportunity to build a relationship with her children.  Her unplanned appearances at the children's school and home and her violations of the no-contact order only deepened the children's feelings of distrust.  Even if Mother acted out of love, the fact remains that these actions demonstrate Mother's inability to empathize with two children who had experienced significant trauma.  At trial, Mother's testimony underscored how little progress she had made in remedying her ability to understand her children's needs.  She dismissed their desire not to see her as coerced and suggested the children felt "no

sadness of any kind" when Father died. Sufficient evidence supports the superior court's findings that Mother was unable to remedy the circumstances that caused the out-of-home placement and there was a substantial likelihood that she would not be able to parent the children safely in the near future.

¶17        Before the superior court may terminate a parent's rights under A.R.S. § 8-533(B)(8)(c), the court must "consider the availability of reunification services to the parent." A.R.S. § 8-533(D). Mother argues the Department failed to provide court-ordered therapeutic visits and other interventions recommended by professionals retained by Mother. The Department must provide services with a reasonable probability of success but is not required to undertake rehabilitative measures that are futile or would risk harm to the children. *See Mary Ellen C. v. Ariz. Dep't of Econ. Sec.*, 193 Ariz. 185, 192, ¶ 34 (App. 1999). Here, even as the Department attempted to coordinate visits, the children refused visits with Mother and reported they were afraid of her. At trial, Valerie's therapist[2] testified that forcing such visits "would have been absolutely detrimental" to the children's progress because in their minds, Mother represents a "huge piece of their trauma." The Department cannot be expected to repair in two years a relationship Mother had been unable to correct for more than a decade. The record supports the court's finding that the Department made diligent efforts to provide appropriate reunification services with a reasonable probability of success.

II.     Best Interests

¶18        Mother argues that the superior court erred in determining termination is in the children's best interests. To prove termination is in the children's best interests, the Department must demonstrate that termination would either benefit the children or that the children would be harmed if their relationship with Mother continued. *See Dominique M.*, 240 Ariz. at 98, ¶ 8. The superior court must "balance the rights of an unfit parent" against the children's interest "in obtaining a loving, stable home" or "avoiding a potentially harmful relationship" with the parent. *Kent K.*, 210 Ariz. at 287, ¶ 37.

¶19        Valerie and Kyle, now fifteen years old, have been the subject of litigation for practically their entire lives and have faced significant challenges since Father's death. The Department presented evidence that

---

2        The therapist also served as Kyle's case manager and reviewed his progress and treatment needs.

the children were in an adoptive placement meeting their needs and helping them achieve much-needed stability. *See Demetrius L.*, 239 Ariz. at 4-5, ¶¶ 15-16 (noting that protecting children's interest in stability and security must be paramount). Mother's argument emphasizes her biological connection to the children; in doing so, she essentially invites us to reweigh the evidence before the superior court. We will not do so. And to the extent Mother argues the court should have given her additional time to work through therapeutic services, the record shows that delaying termination would only create a detriment to the children, forcing them to linger in the system without a sense of permanence. The court did not err in finding termination to be in the children's best interests.

## CONCLUSION

**¶20** For the foregoing reasons, we affirm the superior court order terminating Mother's parental rights to her children.



AMY M. WOOD • Clerk of the Court
FILED:   AA